UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| TAMAR HOD, M.D., * | |
| * | |
| Plaintiff, * | |
| * | |
| v. * | Civil Action No. 1:19-cv-10365-IT |
| * | |
| BRIGHAM AND WOMEN'S HOSPITAL, * | |
| INC.; THE GENERAL HOSPITAL * | |
| CORPORATION; PARTNERS * | |
| HEALTHCARE SYSTEM, INC.; JOSEPH * | |
| BONVENTRE, M.D., * | |
| * | |
| Defendants. * | |

MEMORANDUM AND ORDER
March 30, 2021

TALWANI, D.J.

Plaintiff Tamar Hod, M.D., alleges that Defendants Brigham and Women's Hospital, Inc., The General Hospital Corporation, and Partners Healthcare System, Inc., breached a contract and the implied covenant of good faith and fair dealing by terminating her from their Joint Nephrology Fellowship Program. Complaint, Counts I and II [#1-1]. She alleges further that these Defendants conditioned her continued employment on self-funding and thereby discriminated against her based on her national original in violation of Title VII and Massachusetts General Laws ch. 151B, id., Counts III and IV, and that they (together with Defendant Joseph Bonventre, M.D.) retaliated against her when she refused to self-fund her position. Id., Count V. Defendants seek summary judgment. See Motion for Summary Judgment by Defendants Brigham and Women's Hospital, The General Hospital Corporation, and Joseph Bonventre, M.D. [#34]; Partners Healthcare System, Inc.'s Supplemental Motion for Summary Judgment [#37]. For the reasons set forth below, the court finds that Plaintiff can show no breach of contract or of the implied covenant of good faith and fair dealing, no discrimination based on national origin, and no retaliation based on protected activity.

Accordingly, Defendants' motions are ALLOWED.[1]

I. Factual Background

Based on the summary judgment record,[2] a reasonable jury could find as follows:

Tamar Hod, M.D., was born in Israel and is an Israeli citizen. Prior to the events at issue here, Dr. Hod completed a yearlong fellowship at Brigham and Women's Hospital, Inc. ("BWH"), where she worked with Anil Chandraker, M.D.

BWH and The General Hospital Corporation ("Massachusetts General Hospital" or "MGH") run a Joint Nephrology Fellowship Program ("Fellowship Program").[3] Dr. Bonventre is the Chief of the Division of Renal Medicine at BWH, and Dr. Tucker is the Program Director of the Fellowship Program.

In the Spring of 2015, Dr. Chandraker communicated with Dr. Hod's husband, Adi Hod, regarding the possibility of a fellowship position for Dr. Hod at BWH. Dr. Chandraker offered to assist in obtaining a position for Dr. Hod in the Fellowship Program, but repeatedly explained that because Dr. Hod was neither a citizen nor a green-card holder, funding from the National Institutes of Health ("NIH") would not be available for the research years of the Fellowship Program. Dr. Chandraker's wife, an immigration attorney, suggested that the Hods make a donation to fund Dr. Hod's position. Although Dr. Hod was reluctant to proceed this way, Dr. Chandraker made clear that there was no other option, and ultimately the Hods conveyed their agreement to provide the

---

[1] The court does not reach the supplemental argument raised by Partners Healthcare System, Inc. ("Partners") that Plaintiff was employed by one of the other Defendants only and that there is no evidence to support the single employer doctrine.

[2] As discussed further below, on a motion for summary judgment, the court views the evidence in the light most favorable to the nonmoving party and resolves any disputes of material fact in her favor. See Prescott v. Higgins, 538 F.3d 32, 39 (1st Cir. 2008). Except as indicated, the facts here are taken from the parties' Local Rule 56.1 statements and responses, and are undisputed or not properly disputed for purposes of summary judgment. See Fed. R. Civ. P. 56(c), (e)(2).

[3] Plaintiff alleges that Partners is also a party-in-interest in the Fellowship Program.

funding.

Fellows were only admitted to the Fellowship Program where a funding commitment had been identified. Dr. Chandraker advised the Fellowship Program leaders that Dr. Hod would have funding, and following that assurance, Dr. Hod was admitted to the Fellowship Program and sent an offer letter dated April 13, 2015. Dr. Hod accepted the offer, and in April 2015, Mr. Hod corresponded with Patricia Reaser, the Administrative Director of the Renal Division, about the amount of the donation and when and how it would need to be made, and agreed that it would be transferred by the middle of June 2015.

In the months before Dr. Hod's August 2015 start date, Mr. Hod continued to communicate with a handful of BWH and Partners employees about how he and/or his company would provide funding for Dr. Hod's research year. Before Mr. Hod provided the promised funding, Dr. Hod commenced the Fellowship Program and signed the Graduate Trainee Agreement of Appointment/Contract ("Trainee Agreement"). The Trainee Agreement stated that it set forth Plaintiff's "responsibilities and benefits as a Clinical and Research Fellow . . . for the one year beginning August 3, 2015."[4]

Although Dr. Hod began in a research year, a fellow in a clinical year left and Dr. Hod was allowed to move into his clinical year spot. The clinical position did not require outside funding, but Patricia Reaser advised Mr. Hod that he would still need to make a donation to cover Dr. Hod's first month (when she was in the research position). Mr. Hod did not provide these funds.

BWH's online evaluation system contains mixed evaluations of Dr. Hod's performance, including some dated prior to May 2016. However, Dr. Hod did not receive any negative feedback

---

[4] The Parties have not presented an executed Trainee Agreement for the year beginning August 2016, and there is no evidence in the summary judgment record as to whether Dr. Hod was offered or signed a Trainee Agreement for that year.

3

about her research focus or interpersonal issues prior to May of 2016.

No other fellows were required to supply a personal donation to fund their position, and by May 2016, Dr. Hod advised Dr. Bonventre that the Hods would not be providing the funding for her position. Also in May 2016, Dr. Bonventre told Dr. Hod that without funding she could not stay in the Fellowship Program, and that the Fellowship Program was not obligated to provide funding beyond the second year of her fellowship.

Dr. Bonventre asserts that at some point between March of 2016 and the Fall of 2016, his view of Dr. Hod's long term potential at BWH changed based on conversations with doctors in the Fellowship Program, reports concerning Dr. Hod's interpersonal skills, and her decision to not continue transplantation research. According to Dr. Bonventre, he and Dr. Tucker made the decision at some point in the Fall of 2016 that Dr. Hod would not stay in the Fellowship Program beyond that year.

In October 2016, Dr. Bonventre met with Dr. Hod to discuss her future in the Fellowship Program. Dr. Bonventre expressed that he was open to Dr. Hod staying in the Fellowship Program, but the Renal Division would not provide funding, nor would they support grants that required a future faculty appointment. Also in October, Dr. Tucker met with Dr. Hod and told her that the "consensus opinion" was that her interpersonal skills were "terrible."

In November 2016, Dr. Bonventre met with Dr. Hod again and told her that funding considerations did not influence his decision to not provide a letter of support for her application for grants to fund her position.

In January 2017, Dr. Bonventre sent Dr. Hod a letter as a follow up to the October 2016 meeting.[5] In the letter, Dr. Bonventre recounted that he had told her at the October meeting that BWH would not offer her a position, fellow or faculty, beyond when she was scheduled to complete

---

[5] John Co, M.D., a Partners' employee, reviewed the letter before it was sent to Dr. Hod.

4

the second year of her fellowship on August 31, 2017. The letter also stated that Dr. Bonventre had advised her that, because they had no intention to keep her on, she should not apply for research grants for the third year that require a future appointment. The letter stated further that she had asked about interpersonal concerns in the October 2016 meeting and that Dr. Bonventre had referred her to Dr. Tucker to discuss these concerns.

Defendants did not seek additional sources of funding for Plaintiff to continue beyond a second year and did not agree to sponsor her in connection with any grants she might apply for.

Dr. Hod remained in the program through the second year, despite the absence of any outside funding. By the end of the second year, Dr. Hod completed the ACGME portion of the Fellowship Program. Dr. Hod was not permitted to continue for a third year in the Fellowship Program.

Other fellows who received negative feedback about interpersonal issues were placed on improvement plans; they were not counseled or terminated from the Fellowship Program.

II. Standard of Review

Summary judgment is appropriate in the absence of a genuine issue of material fact when the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). To the extent facts are disputed, they are considered in the light most favorable to the non-movant, and reasonable inferences will be drawn in that party's favor. Tolan v. Cotton, 572 U.S. 650, 655-56 (2014) (per curiam) (quoting Adickes v. S.H. Kress Co., 398 U.S. 144, 157 (1970) ("[A] court must view the evidence 'in the light most favorable to the opposing party.'")). "Only if the record, viewed in that manner and without regard to credibility determinations, reveals no genuine issue as to any material fact may the court enter summary judgment." Cadle Co. v. Hayes, 116 F.3d 957, 959 (1st Cir. 1997) (citing Greenburg v. Puerto Rico Maritime Shipping Auth., 835 F.2d 932, 936 (1st Cir. 1987)).

However, "[i]f a party fails to properly support an assertion of fact or fails to properly

5

address another party's assertion of fact as required by Rule 56(c), the court may . . . grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it." Fed R. Civ. P. 56(e); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986) ("[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.") (internal citations omitted); Thompson v. Coca-Cola Co., 522 F.3d 168, 175 (1st Cir. 2008) (quoting Pagano v. Frank, 983 F.2d 343, 347 (1st Cir. 1990) ("To defeat a motion for summary judgment, the evidence offered by the adverse party cannot be 'merely colorable' or speculative.")).

"When a [party] opposes summary judgment, she bears the burden of producing specific facts sufficient to deflect the swing of the summary judgment scythe." Theidon v. Harvard Univ., 948 F.3d 477, 494 (1st Cir. 2020) (internal citation and quotation omitted). For this purpose, a plaintiff cannot rely on "conclusory allegations, improbable inferences, acrimonious invective, or rank speculation," Ahern v. Shinseki, 629 F.3d 49, 54 (1st Cir. 2010); "[i]n other words, the 'evidence illustrating the factual controversy cannot be conjectural or problematic; it must have substance in the sense that it limns differing versions of the truth which a factfinder must resolve at an ensuing trial.'" Cadle Co., 116 F.3d at 960 (quoting Mack v. Great Atl. & Pac. Tea Co., 871 F.2d 179, 181 (1st Cir. 1989)).

III. Discussion

   A. Contract Claim

"In order to state a viable breach of contract claim under Massachusetts law, plaintiffs must prove that a valid, binding contract existed, the defendant breached the terms of the contract, and

the plaintiffs sustained damages as a result of the breach." Brooks v. AIG SunAmerica Life Assur. Co., 480 F.3d 579, 586 (1st Cir. 2007).[6]

"As to the first element—i.e., whether there is a contract—'[a]ll the essential terms of a contract must be definite and certain so that the intention of the parties may be discovered, the nature and extent of their obligations ascertained, and their rights determined.'" Cooper v. Kenexa Tech., Inc., Civ. Action No. 10-cv-12189-DJC, 2012 WL 2946012, at *4 (D. Mass. July 19, 2012) (quoting PSMG Int'l v. Nodine's Smokehouse Inc., Civ. Action No. 8-cv-10269-RGS, 2009 WL 3679288, at *2 (D. Mass. Nov. 3, 2009)). "A lack of definiteness in an agreement might be based on a lack of specificity regarding the time of performance, price to be paid, work to be done, or property to be transferred" and will vary based on the facts of the individual case. Armstrong v. Rohm & Haas Co., 349 F. Supp. 2d 71, 78-79 (D. Mass. 2009). As to the second element – breach – a plaintiff must do more than allege, in conclusory fashion, that the defendant breached the contract, and must instead describe with "substantial certainty" the specific contractual promise the defendant failed to keep. Buck v. Am. Airlines, Inc., 476 F.3d 28, 38 (1st Cir. 2007).

Defendants argue that Dr. Hod's contract claim is based on the Offer Letter; the Offer Letter only obliged them to admit Dr. Hod to the Fellowship Program; and as Plaintiff has failed to show any breach of this agreement, the contract claim fails. Defendants argue further that the Offer Letter does not contain essential terms, such as compensation, necessary for an employment agreement, and that these terms are found only in the one-year Trainee Agreement, which Dr. Hod concedes was not breached.

Plaintiff agrees that her contract claim is based on the Offer Letter, and argues that the Offer Letter provided the term of four years and that the other terms, including her salary, were addressed in other documents, including the Trainee Agreement. In support of her reading of the Offer Letter,

---

[6] Plaintiff does not dispute that Massachusetts law applies to her contract claim.

7

Plaintiff relies on statements made by leaders of the Fellowship Program that there was a general expectation a fellow would stay for four years and a print-out from BWH's website entitled "Joint Nephrology Fellowship Funding for Years 2-4" stating that fellows will be paid and funded in their second through fourth years from a combination of sources.

The court begins with the plain language of the Offer Letter. See EventMonitor, Inc. v. Leness, 473 Mass. 540, 549, 44 N.E.3d 848 (2016) (explaining that when interpreting a contract, courts must begin with its plain language). The Offer Letter stated in relevant part:

> The Fellowship Selection Committee of the Fellowship Program in Nephology at [BWH] and [MGH] is very pleased to offer you <u>a position</u> within our program, beginning August 1, 2015. This <u>appointment</u> is contingent upon successful completion of an ACGME -accredited[7] internal medicine training program . . . .
>
> The program is structured within four years as twelve months of primarily clinical training and thirty-six months of primarily research training. The second year, however, will include clinical responsibilities to be determined at the discretion of the Program Director. The first two years are accredited by the ACGME. The third and fourth years are not accredited by the ACGME and will focus on research but will include clinical experience in order to optimize your clinical training.
>
> Please be assured that we will do all we can to make your experience with us as rewarding and productive as possible. Please confirm your acceptance of this <u>appointment</u> in writing as soon as possible.

Offer Letter [#49-1] (emphasis added). Based on the plain language, the Offer Letter was for an "appointment" to "a position within [the] program, beginning August 1, 2015." Id. Although the Offer Letter described the Fellowship Program's four-year structure, it did not specify a four-year term, but only the appointment to the program, with no guarantees as to how long Plaintiff would remain in the program.[8]

---

[7] ACGME is the Accreditation Council for Graduate Medical Education.

[8] Plaintiff makes no claim that the 2015-16 Trainee Agreement was breached, and in any event, any such claim would fail. The Trainee Agreement lists compensation and other benefits for the 2015-16 year, and identifies the Fellowship Program's further responsibilities as providing a suitable academic environment, a program that meets the standards of the ACGME, and a certification of completion. Trainee Agreement [#36-1]. The Trainee Agreement provides further that where "this engagement will not be renewed (other than by mutual agreement or program completion)," the

8

As the Offer Letter offered only an appointment to a position in the Fellowship Program and no fixed term, Plaintiff can show no breach. Dr. Hod joined the Fellowship Program and graduated, with ACGME accreditation, in 2017. Plaintiff's understanding that the Fellowship would generally last for four years does not suffice for purposes of a breach of contract claim. "[P]arties are bound by the plain terms of their contract, and their subjective contemplations are immaterial where the agreement is unambiguous." Coll v. PB Diagnostic Systems, Inc. 50 F.3d 1115, 1122 (1st Cir. 1995) (citing Hiller v. Submarine Signal Co., 325 Mass. 546, 550, 91 N.E.2d 667 (1950)).

The court notes finally that even if Plaintiff's subjective understanding could be considered, her claim would fair no better. While the Fellowship Program generally may have lasted for four years, her specific offer and acceptance did not contemplate a four-year term. When Dr. Hod received the Offer Letter (and before accepting the offer), she emailed Dr. Chandraker noting that "[a]ccording to the letter I should complete a 4 years fellowship and we were talking about total of 2 years." Ex. 3 to Hod Dep. 15 [#51-4] (emphasis added). Dr. Hod also reminded him that she had not completed an ACGME internal medicine training program as required by the Offer Letter. Id. She asked, "Will I still be certified after 2 years?" Id. Dr. Chandraker promptly clarified that "[t]he offer letter is standard and neither of those [terms] will apply to you." Id. (emphasis added).

Plaintiff's claim that she had an agreement for a four-year term fails.

B. Breach of Implied Covenant

In Massachusetts, "[e]very contract implies good faith and fair dealing between the parties to it." T.W. Nickerson, Inc. v. Fleet Nat. Bank, 456 Mass. 562, 569-70, 924 N.E.2d 696 (2010)

---

graduate trainee would be given written notice no later than four months prior to the end of the one year period, and could request a hearing. Id. Although the engagement was not formally renewed for the following year (in that no new Trainee Agreement was signed), Plaintiff continued in the Fellowship Program under the same terms for the full second year. Moreover, Plaintiff had written notice no later than January 2017 that her position would end in August 2017, eight months later, and Plaintiff sought no hearing.

9

(internal quotation and citation omitted). This implied covenant provides that "neither party shall do anything that will have the effect of destroying or injuring the right of the other party to the fruits of the contract." Anthony's Pier Four, Inc. v. HBC Assocs., 411 Mass. 451, 471, 924 N.E.2d 696 (1991) (quoting Druker v. Roland Wm. Jutras Assocs., 370 Mass. 383, 385, 348 N.E.2d 763 (1976)). "A breach of the covenant occurs when one party to a contract 'violates the reasonable expectations of the other.'" Suzuki v. Abiomed, Inc., 943 F.3d 555, 562 (1st Cir. 2019) (quoting A.L. Prime Energy Consultant, Inc. v. Mass. Bay Transp. Author., 479 Mass. 419, 95 N.E.3d 547 (2018)). However, the "scope of the covenant is only as broad as the contract that governs the particular relationship." Ayash v. Dana-Farber Cancer Inst., 443 Mass. 367, 385, 822 N.E.2d 667 (2005). The covenant cannot "create rights and duties not otherwise provided for in the existing contractual relationship, as the purpose of the covenant is to guarantee that the parties remain faithful to the intended and agreed expectations." Uno Rests., Inc. v. Bos. Kenmore Realty Corp., 441 Mass. 376, 385, N.E.2d 957 (2004).

      Plaintiff alleges BWH, MGH, and Partners breached the covenant of good faith and fair dealing by "frustrat[ing] [her] ability to continue in the four-year program." Compl. ¶ 127 [#1-1]. In her telling, she held a reasonable expectation that, having been offered a position in the program, she would be funded for four years. But Plaintiff has failed to show that any such expectation for funding was reasonable. Thus, that other candidates may have been admitted to the Fellowship Program with different assurances and expectations is of no moment.

      Here, as evidenced by numerous communications in the record, Plaintiff was offered a position in the Fellowship Program based on the understanding that she had her own funding. She did not advise the Fellowship Program that this funding would not be forthcoming until May of her first year. Despite the absence of promised funding, she was permitted to continue in the Fellowship Program for the second year and received a certificate of completion. While Plaintiff may believe

10

that Defendants should have helped her find funding for her position, the contract created by her offer and acceptance did not include an implied promise from Defendants to fund her position or even to help her find funding. Dr. Hod received the benefits prescribed by the terms of the contract – appointment to the Fellowship Program – and more, namely a year and a month during which she was permitted to continue in the Fellowship Program without any outside funding, which allowed her to complete two years and obtain an ACGME certificate of completion. There was no breach. See Uno Rests., 441 Mass. at 385 ("The covenant [of good faith and fair dealing] is preserved so long as neither party injures the rights of another to reap the benefits prescribed by the terms of the contract.").

C. National Origin Discrimination Under Title VII and Massachusetts Gen. Laws ch. 151B

Title VII forbids employers from failing to hire, discharging, or otherwise discriminating against any individual "with respect to . . . compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Massachusetts Gen Laws ch. 151B similarly prohibits discrimination based on national origin and other grounds. See Abramian v. President & Fellows of Harvard Coll., 432 Mass. 107, 116, N.E.2d 1075 (2000) (citing Mass. Gen. Laws ch. 151B, § 4(1)). Plaintiff asserts that she was obligated to self-fund her Fellowship position because of her national original and when she did not do so, she was terminated from that position, in violation of both statutes.[9]

    1. Plaintiff Need Not Base Her Claim on Discrimination as to a Particular Country, but May Not Proceed on a Citizenship Discrimination Claim

Defendants argue Dr. Hod's claim fails because "she denies she was discriminated against

---

[9] The Supreme Judicial Council "frequently looks to federal court interpretations of Title VII for guidance" when the provisions of Chapter 151B and Title VII are substantially similar. Noviello v. City of Bos., 398 F.3d 76, 91 (1st Cir. 2005). Neither side argues that the two claims should be treated differently here.

11

due to her national origin." BWH et al.'s S.J. Mem. 5 [#35] (quoting Hod Dep. 10:22-11:9, 12:8-9, 12:11-14 [#36-1] (Hod's statements that she was not mistreated because she "was Israeli.")). Plaintiff contends, however, that she is not claiming that she was discriminated against because she is Israeli, but more generically, because of her foreign national origin. If a plaintiff claims that she is discriminated against because she is from a particular region of the world, or because her ancestors are from a particular region, for example, from the Middle East, a national original claim could be asserted without the need to identify a specific country as the focus of the discriminatory animus. See Kanaji v. Children's Hosp. of Phila., 276 F. Supp. 2d 399, 401-02 (E.D. Pa. 2003) (explaining that the Supreme Court, following Espinoza v. Farah Mfg. Co., Inc., 414 U.S. 86, 94 (1973), "would not require that one's 'national origin' be linked directly to a specific country or nation," and instead, that national origin is "better understood by reference to certain traits or characteristics that can be linked to one's place of origin, as opposed to a specific country"); 29 C.F.R. § 1606.1 (Equal Employment Opportunity Commission ("EEOC") defines national origin discrimination to include discrimination based on "an individual's, or his or her ancestor's, place of origin; or because an individual has the physical, cultural or linguistic characteristics of a national origin group"). And to the extent that Dr. Hod claims discrimination against persons who are foreign born or who are of recent foreign ancestry (regardless of citizenship or immigration status), such a claim against perceived outsiders may still be cognizable. See U.S. Equal Emp. Opportunity Comm'n v. MVM, Inc., Civ. Action No. TDC-17-2864, 2018 WL 2197727, *9 (D. Md. May 14, 2018) (explaining that the EEOC interprets Title VII to "prohibit discrimination based on perceived national origin") (citing U.S. Equal Emp. Opportunity Comm'n, Enforcement Guidance on National Origin Discrimination (Nov. 18, 2016), https://www.eeoc.gov/laws/guidance/upload/national-origin-guidance.pdf); Frazier v. Exide Tech., Civ. Action No. 11-1863, 2012 WL 440398, *3 (E.D. Pa. Feb. 13, 2012) (citing cases allowing national origin discrimination claims to go forward at

summary judgment where there was "evidence of discrimination directed . . . at the employee's 'foreignness').

However, to the extent Dr. Hod's claim is that she is a member of a protected class consisting solely of "foreigners," her claim may not proceed without a showing that the resultant discrimination is based on national origin or ancestry, which is prohibited by Title VII and Mass. Gen. Laws ch. 151B, rather than citizenship or immigration status, which is not prohibited by either statute. The Supreme Court has explained that "on its face," "national origin" under Title VII does not refer to citizenship status, but "refers to the country where a person was born, or, more broadly, the country from which his or her ancestors came," and that the statute's legislative history fully supports this construction. Espinoza, 414 U.S. at 88. For these reasons, and based on numerous other federal statutory schemes, the Supreme Court has concluded "that Congress did not intend the term 'national origin' to embrace citizenship requirements." Id. at 89; see also Dowling v. United States, 476 F. Supp. 1018, 1022 (D. Mass. 1979) (dismissing plaintiff's national origin discrimination claim based on Title VII because Title VII does not bar employment discrimination based on citizenship or alienage). The Massachusetts Supreme Judicial Court has also adopted this understanding in its interpretation of Chapter 151B. See Nguyen v. Univ. of Massachusetts, 66 Mass. App. Ct. 276, 282, 846 N.E.2d 1184 (2006), aff'd on other grounds sub nom. Nguyen v. William Joiner Ctr. For Study of War & Soc. Consequences, 450 Mass. 291, 877 N.E.2d 1266 (2007).

In Espinoza, the Supreme Court acknowledged that "a citizenship requirement might be but one part of a wider-scheme of unlawful national-original discrimination," or "an employer might use a citizenship test as a pretext to disguise what is in fact national-origin discrimination" and that Title VII "prohibits discrimination on the basis of citizenship whenever it has the purpose or effect of discriminating on the basis of national origin." 414 U.S. at 92. The Court then considered

13

whether those principles supported the claims in that case (and found that they lent no support to plaintiffs there). The court proceeds in a similar manner here.

### 2. Plaintiff's Disparate Treatment Claim

For Plaintiffs, like Dr. Hod, who have not proffered direct evidence of discrimination, the court relies on the three-step burden shifting scheme outlined in McDonnell Douglas Corp. v. Green, 411 U.S. 792 U.S. 792 (1973), to assess whether a jury could infer discriminatory treatment from the facts in the summary judgment record.

#### a. Step One: Prima Facie Case

Under the McDonnell Douglas framework, a plaintiff must carry the initial burden of showing a prima facie case of discrimination. To do so in assessing the decision to terminate an employee, the plaintiff must show (1) she is a member of a protected class, (2) she met her employer's expectations, (3) she suffered adverse employment action and was discharged, and (4) after rejecting the plaintiff, the position remained open, and the employer continued to seek applicants from persons of plaintiff's qualifications, see Cham v. Station Operators, Inc., 685 F.3d 87, 93 (1st Cir. 2012), or that others similarly situated to her in all relevant respects were treated differently by the employer. See Ray v. Ropes & Gray LLP, 799 F.3d 99, 114 (1st Cir. 2015).

"The prima facie case serves an important function in the litigation: it eliminates the common nondiscriminatory reasons for the plaintiff's rejection." Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 254 (1981). The prima facie case thus "raises an inference of discrimination . . . because we presume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors." Furnco Constr. Corp. v. Waters, 438 U.S. 567, 577 (1978).

Dr. Hod has provided evidence to meet the first three requirements for a prima facie case of national origin discrimination. As discussed above, she is of foreign origin and may claim

discrimination against persons because of foreign origin or ancestry (so long as it is not simply based on citizenship). She received mixed performance reviews during her fellowship from which a jury could conclude that she generally met performance expectations. The decision not to allow her to continue after her second year was an adverse employment action.

Dr. Hod also presented evidence that all other fellows were funded, and that no other fellow had ever been funded by a family member's donation. However, to the extent that Dr. Hod's claim is that she was treated differently because she was ineligible for NIH funding, her termination would not be unlawful under Title VII, as NIH funding is based on immigration status, not national origin.

Dr. Hod also claims that other funding (instead of a family member's donation) was made available to other fellows who were ineligible for NIH funding, but has offered no information as to the national origin of the fellows who obtained this other support. To the extent that those fellows were ineligible for NIH funding because of their citizenship status, they, like Dr. Hod, are also foreigners; that they were funded while Dr. Hod was not undermines rather than supports the claim of national origin discrimination. Accordingly, Plaintiff's showing does not raise an inference of unlawful discrimination.

The court recognizes that "[e]stablishing a prima facie case isn't usually a tough sell." Rivera-Rivera v. Medina & Medina, Inc., 898 F.3d 77, 88 (1st Cir. 2018) (citing Koseireis v. Rhode Island, 331 F.3d 207, 213 (1st Cir. 2013)). The court therefore briefly considers the remaining steps of the McDonnell Douglas framework to ensure that this claim is not being rejected without full consideration.

### b. Step Two: Evidence of Non-Discriminatory Explanation

If the plaintiff establishes a prima facie case, at step two "the burden of production—but not the burden of persuasion—shifts to [defendants], who must articulate a legitimate, non-

15

discriminatory reason" for terminating the plaintiff. Johnson v. Univ. of P.R., 714 F.3d 48, 53-54 (1st Cir. 2013). Here, Defendants dispute funding played any role in their decision to not allow Dr. Hod to continue in the Fellowship Program. Instead, Defendants presented evidence that multiple evaluators commented that Dr. Hod's performance in the Fellowship Program fell below standards. For example, one of Dr. Hod's patients at the VA hospital complained that, during an appointment, Dr. Hod was "taking personal phone calls, checking personal emails and checking her phone [and] was not paying attention and did not seem interested in what she was doing." Correspondence, Ex. 29 [#49-29]. Leaders of the Fellowship Program also explained that because she would not be a suitable candidate for Harvard Medical School faculty, they would not advance her in the Fellowship Program because a faculty appointment would likely follow the third or fourth year.

### c. Step Three: Dr. Hod's Evidence of Pretext and Discrimination

Once defendants offer evidence of nondiscriminatory reasons for their action, the burden shifts back to the plaintiff to show that the reason proffered was a ruse and that, instead, she was terminated based on her national origin. See Feliciano de la Cruz v. El Conquistador Resort & Country Club, 218 F.3d 1, 6 (1st Cir. 2000). At this step, "the McDonnell Douglas framework 'disappears' and the sole remaining issue is 'discrimination *vel non*." Ray, 799 F.3d at 113 (quoting Cham, 685 F.3d at 93).

It is insufficient to "merely impugn the veracity of the employer's justification," Azimi v. Jordan's Meats, Inc., 456 F.3d 228, 246 (1st Cir. 2006) (citations and internal quotation marks omitted), to avoid summary judgment at step three; instead, the plaintiff must show "by a preponderance of the evidence that [the defendants'] proffered reason is pretextual and that the actual reason for the adverse employment action is discriminatory." Johnson, 714 F.3d at 54; see also Mariani-Colón v. Dep't of Homeland Sec. ex rel. Chertoff, 511 F.3d 216, 223 (1st Cir. 2007) (the plaintiff "must produce sufficient evidence to create a genuine issue of fact as to two points:

16

1) the employer's articulated reasons for its adverse actions were pretextual, and 2) the real reason for the employer's actions was discriminatory animus"). In other words, Dr. Hod must present evidence such that a reasonable jury could find she was not terminated for performance issues, but because of her national origin. See Rivera-Rivera, 898 F.3d at 88.

In evaluating whether summary judgment is appropriate, the court must weigh all the circumstantial evidence of discrimination, including the strength of the prima facie case and the employer's proffered reasons for its action. Feliciano, 218 F.3d at 7. "Although evidence of national origin animus need not be of the smoking gun variety . . . the totality of the circumstances must permit a reasonable inference that the employer's justification for the challenged action was a pretext for discrimination." Id. at 8 (alterations and internal citation omitted).

Plaintiff has presented some evidence from which a jury could find that she was, overall, reasonably well-regarded at BWH. Plaintiff points out that the negative feedback was not specific or contemporaneous; some faculty evaluators rated her as exceeding expectations; Dr. Bonventre shared laudatory descriptions of her potential and performance with the Department of Homeland Security when applying for a visa waiver; and she was given an excellent rating for patient care in her summative evaluation.

Plaintiff also presents evidence that other fellows were criticized for interpersonal and other performance issues and were not terminated, but instead were put on improvement plans. But critically, Plaintiff has presented no evidence that the fellows who were put on improvement plans did not also have NIH funding, or that the fellows who BWH supported for other outside funding were criticized for interpersonal or other performance issues. Without such showings, the court does not any support for the claim that BWH's reason for not supporting outside funding for Plaintiff was pretextual.

Finally, even if Plaintiff could show that the reason was pretextual, Plaintiff has made no

17

showing that the real reason that Plaintiff was terminated was her national origin. Dr. Hod has offered no evidence that Defendants engage in a practice of terminating foreign-born fellows or have adopted policies that discriminate on the basis of national origin. Nor has she proffered any statements of Defendants indicating a bias against foreign born fellows and, in fact, undisputed evidence exists to the contrary. See List of Fellows and Status [#49-39] (no pattern of visa holders not finding continued employment). Consequently, "[s]ubmitting the issue of discriminatory intent to a jury on this record would amount to nothing more than an invitation to speculate." Lattimore v. Polaroid Corp., 99 F.3d 456, 467–68 (1st Cir. 1996); see also Zapata–Matos v. Reckitt & Colman, Inc., 277 F.3d 40 (1st Cir. 2002) (holding that slight suggestion of pretext presented in case absent other evidence of discrimination cannot meet plaintiff's burden on summary judgment).

        3. Plaintiff's Disparate Impact Claim

Dr. Hod also argues that she has provided sufficient evidence to survive summary judgment on a disparate impact theory because the policy to "require outside funding disproportionately affects foreign Fellows." Hod Opp'n to BWH et al. S.J. 14-15 [#46]. But as was made clear in program material and direct communications with Dr. Hod, Fellows must obtain funding for the research positions, and the common source of funding – NIH – is not available to individuals who are not citizens or green card holders. That NIH's policy disproportionately affects foreign Fellows may be a truism, but it is not the basis for a claim.

For the above reasons, the court finds that Defendants BWH, MGH, and Partners are entitled to summary judgment on Dr. Hod's Title VII and Chapter 151B claims.

D. Retaliation

Plaintiff claims that Defendants (now including Dr. Bonaventure) terminated her in retaliation for not making a donation. Although Count V of the Complaint [#1-1] does not identify

the legal basis for the claim, Plaintiff's opposition cites to case law under Chapter 151B.[10] Count VI asserts a claim for retaliation under Title VII.

Both Title VII and Chapter 151B contain provisions that prohibit employers from retaliating against persons who complain about unlawful discriminatory employment practices. See 42 U.S.C. § 2000e-3(a); Mass. Gen. Laws ch. 151B, § 4(4). "A report of conduct that allegedly violates Title VII is protected if the employee who reported the conduct had a 'good faith, reasonable belief that the underlying challenged actions of the employer violated [Title VII].'" Hernández v. Wilkinson, 986 F.3d 98, 103 (1st Cir. 2021) (citing Fantini v. Salem State Coll., 557 F.3d 22, 32 (1st Cir. 2009) (alteration in original)). Accordingly, had Plaintiff made a good faith report that she was being treated differently because of her national origin, her complaint would have amounted to protected conduct under these statutes.

But Plaintiff has presented no evidence that she complained that she was being treated differently based on her national origin. Instead, she points only to her refusal to supply a donation as protected conduct, and states she refused to supply the donation because it was "illegal." Hod Opp'n to BWH et al. S.J. 15 [#46]; Hod Dep. 9:6-9 [#49-34]. Dr. Hod does not explain what law she has mind that would make the donation was illegal. But even if she is correct that self-funding her position would violate some other law, a refusal to violate some other law would still would not amount to protected conduct under either Title VII or Chapter 151B, unless imposition of the allegedly illegal requirement would itself violate Title VII or Chapter 151B. As set forth in the previous section, Plaintiff has shown no such violation.

IV. Conclusion

Plaintiff claims an entitlement to further support from BWH and a continued position in the

---

[10] A "free-standing claim for retaliation does not exist at common law[.]" Cardoso v. City of Brockton, 62 F. Supp. 3d 179, 184 (D. Mass 2014).

Joint Nephrology Fellowship. However, the undisputed facts foreclose Plaintiff's claims against the Defendants as a matter of law. Accordingly, Defendants <u>Motion for Summary Judgment by Defendants Brigham and Women's Hospital, the General Hospital Corporation, and Joseph Bonventre, M.D.</u> [#34] and <u>Defendant, Partners HealthCare System, Inc., Supplemental Motion for Summary Judgment</u> [#37] are ALLOWED.

    IT IS SO ORDERED.

/s/ Indira Talwani<br>United States District Judge

Date:   March 30, 2021